**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SHLOMO SPAR, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CELSION CORPORATION, MICHAEL H. TARDUGNO, JEFFREY W. CHURCH, and NICHOLAS BORYS<br><br>Defendants. | Case No. 3:20-cv-15228-ZNQ-DEA<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** |

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.   STATEMENT OF FACTS ......................................................................... 6

III.  ARGUMENT.............................................................................................. 10

      A.    Legal Standard in Securities Fraud Cases............................................. 10

      B.    Defendants Misrepresent that the Complaint Alleges that Celsion was Unblinded Early to the Results of the Second Interim Analysis ............................................ 11

      C.    The Complaint Adequately Alleges Falsity............................................. 11

            1.    The PSRLA Safe Harbor Does Not Shield Defendants' From Liability .. 16

            2.    Defendants' False and Misleading Statements Are Not Puffery .............. 18

      D.    The Complaint Adequately Alleges Scienter.......................................... 19

            1.    Defendants Were Severely Reckless in Speaking Positively About the OPTIMA Trial Results After the Results Demonstrated That Proceeding with That Trial Was Futile........................................................ 20

            2.    Defendants' Raised $10 Million While Deceiving the Market About the Second Interim Results, Establishing Motive and Supporting a Strong Inference that They Acted With Requisite Fraudulent Intent................... 23

      E.    The Complaint Adequately Pleads Loss Causation............................... 25

      F.    The Complaint Adequately Pleads Reliance.......................................... 27

      G.    The Complaint Adequately Pleads a Section 20(a) Violation .............. 27

IV.   CONCLUSION.................................................................................................... 28

Case 3:20-cv-15228-ZNQ-DEA   Document 30   Filed 09/20/21   Page 3 of 36 PageID: 1055

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bauer v. Eagle Pharms., Inc.*,
No. CV 16-3091(JLL), 2017 WL 2213147 (D.N.J. May 19, 2017) ......................................... 19

*Bonomo v. Nova Fin. Holdings, Inc.*,
No. CIV.A. 11-4762, 2012 WL 2196305 (E.D. Pa. June 15, 2012) ......................................... 24

*Borden v. United States*,
141 S. Ct. 1817 (2021) ........................................................................................................ 22

*Castrol Inc. v. Pennzoil Co.*,
987 F.2d 939 (3d Cir. 1993) ................................................................................................. 18

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014) ................................................................................................. 15

*Derensis v. Coopers & Lybrand Chartered, Accts.*, 930 F. Supp. 1003 (D.N.J. 1996) .................................................................................. 27

*Dudley v. Haub*,
No. 2:11-CV-05196 WJM, 2013 WL 1845519 (D.N.J. Apr. 30, 2013) .................................. 27

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ...................................................................................................... 25, 26

*EP Medsystems, Inc. v. EchoCath, Inc.*,
235 F.3d 865 (3d Cir. 2000) ................................................................................................. 25

*Fort Worth Employers' Ret. Fund v. Biovail Corp.*,
615 F. Supp. 2d 218 (S.D.N.Y. 2009) ................................................................................... 19

*Glidepath Holding B.V. v. Spherion Corp.*,
590 F. Supp. 2d 435 (S.D.N.Y. 2007) ................................................................................... 24

*Hogan v. City of Easton*,
No. CIV.A.04-759, 2006 WL 2645158 (E.D. Pa. Sept. 12, 2006) ......................................... 22

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999) ................................................................................................. 20

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ................................................................................... 12, 18, 21

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) ........................................................................ 13

*In re Columbia Lab'ys, Inc. Sec. Litig.*,
144 F. Supp. 2d 1362 (S.D. Fla. 2001) ................................................................. 13

*In re Complete Mgmt. Inc. Sec. Litig.*,
153 F. Supp. 2d 314 (S.D.N.Y. 2001)................................................................... 24

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) ............................................................................... 17

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
No. CV 17-341, 2020 WL 1479128 (E.D. Pa. Mar. 25, 2020)............................. 15

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................... 24

*In re Nevsun Res. Ltd.*,
No. 12 CIV. 1845 PGG, 2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013).............. 24

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .............................................................................. 16

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993) ..................................................................................... 24

*In re Viropharma Inc. Sec. Litig.*,
21 F. Supp. 3d 458 (E.D. Pa. 2014) ...................................................................... 23

*In re Vivendi Universal, S.A.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003).................................................................... 24

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016).................................................................................. 11

*In re Volkswagen 'Clean Diesel' Mktg.,Sales Pracs., & Prod. Liab. Litig.*,
*No. 2672 C*RB (JSC), 2017 WL 3058563 (N.D. Cal. July 19, 2017)..................... 19

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)...................................................................... 11, 16, 20

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ................................................................................ 21

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)........................................................................................... 10, 20

*McDermid v. Inovio Pharms., Inc.*,
No. CV 20-01402, 2021 WL 601159 (E.D. Pa. Feb. 16, 2021)........................................... 16, 17

*McNally v. Pierce*,
No. CV 12-1303-GMS, 2015 WL 7566667 (D. Del. Nov. 24, 2015) ...................................... 22

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ............................................................................................ 26

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001)................................................................................................. 25

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018).................................................................................... 14

*Omnicare*,
575 U.S. ............................................................................................................................. 15

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)................................................................................................... 1, 2, 13

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000)................................................................................................. 13

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
142 F. Supp. 2d 589 (D.N.J. 2001) ....................................................................................... 27

*Payne v. DeLuca*,
433 F. Supp. 2d 547 (W.D. Pa. 2006).................................................................................... 18

*Rochez Bros. v. Rhoades*,
527 F.2d 880 (3d Cir. 1975)................................................................................................. 27

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)................................................................................................. 12

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000)................................................................................................... 24

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977)............................................................................................................. 21

*Semerenko v. Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000)................................................................................................. 25

*Sonnenberg v. Prospect Park Fin. Corp.*,
No. CIV. 91-435(DRD), 1991 WL 329755 .............................................................................. 22

v

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ......................................................................... 10, 20, 21

*Tomaszewski v. Trevena, Inc.*,
   482 F. Supp. 3d 317 (E.D. Pa. 2020) ................................................... 24

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) ............................................................................ 12, 19

*Weiner v. Quaker Oats Co.*,
   129 F.3d 310 (3d Cir. 1997) ................................................................ 21

*Weinstein v. Kirkman*,
   No. C13-0769-JCC, 2013 WL 12121125 (W.D. Wash. Sept. 16, 2013) ................................ 13

*Winer Fam. Tr. v. Queen*,
   503 F.3d 319 (3d Cir. 2007) ................................................................ 10

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*,
   426 F. Supp. 3d 864 (D. Kan. 2019) ..................................................... 24

*Zhengyu He v. China Zenix Auto Int'l Ltd.*,
   No. CV21815530KMJAD, 2020 WL 3169506 (D.N.J. June 12, 2020) ................................ 26

**Statutes**

15 U.S.C. § 78t(a) ............................................................................... 27

15 U.S.C. § 78u-4(b) ........................................................................... 10

**Rules**

Fed. R. Civ. P. 9(b) ........................................................................... 10

Fed. R. Civ. P. 15(a) (2) ...................................................................... 28

Lead Plaintiff Milan Taraba ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss the Amended Complaint ("Complaint") (Dkt. No. 19) filed by Defendants Celsion Corporation ("Celsion" or "Company"), Michael H. Tardugno, Jeffrey W. Church, and Nicholas Borys. Dkt. No. 28.[1] For the reasons stated herein, Defendant's motion should be denied in its entirety.

## I.    INTRODUCTION

The Court must resolve, as a matter of law, whether an opinion can be actionable when facts exist at the time a registrant disseminates an opinion, rendering it wholly false. No question exists that the second interim results were complete by the beginning of the Class Period and that Celsion's proceeding with the OPTIMA trial was futile. In light of those immutable, then-existing facts, Defendants not only issued new and positive statements about accelerated FDA approval, but they leveraged their positive Class Period statements to raise $10 million. When they finally disclosed the futility of continuing with the OPTIMA trial, the stock price fell, damaging investors.

The fundamental question here is not whether the study at issue was unblinded, whether Defendants knew of the futility of continuing with the OPTIMA trial. Whether or not they did, the Complaint does not allege that they knew or that the DMC prematurely unblinded the second interim results. The question, instead, is whether Defendants were severely reckless in saying anything about the OPTIMA trial results given that at the time they spoke, proceeding was futile. In *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 191 (2015), the Supreme Court ruled that an opinion can materially mislead for the speaker's omitting facts or opinions that rebut the speaker's inference. because a reasonable investor "expects such an

---

[1] Defendants' Memorandum of Points and Authorities (Dkt. No. 28-1) is referred to herein as "D.Br."

assertion to rest on some meaningful … inquiry—rather than say, on mere intuition, however sincere." *Id.* Defendants' dissemination of their Class Period statements in the face of existing fact contradicting their opinions constitutes an extreme departure from the standards of ordinary care, and the Complaint adequately pleads fraud.

Throughout the Class Period, Defendants spoke about possible positive results in the second interim analysis, knowing that the data set was complete. Defendants' positive statements were not even supported by the results of the first interim analysis. Though the DMC recommended continuing the OPTIMA trial at the first interim analysis, Celsion admitted that the trial had not met the hazard ratio for success at that interim analysis. Nevertheless, starting in April 2020, in the face of those then-existing facts, Defendants touted a possible result that the data wholly belied. Far from a candidate for FDA approval, ThermoDox was a failure such that even completing the OPTIMA trial was futile. The risk was worth it to Defendants, whose statements contributed to inflating Celsion's stock price artificially. Taking direct advantage, they raised money for fewer shares of stock than it would have cost them just months earlier. Defendants took a risk, but that risk having failed, they want no part of bearing its costs. Instead, they want investors, who bid the price up because of Defendants' statements, to bear the costs of Defendants' reckless gamble.

Notwithstanding their acknowledging that the Complaint does not allege that they knew the results in advance of the DMC's July 2020 report, Defendants erect and knock down a straw person. Repeatedly, they assert that the Complaint alleges that they were unblinded to the results from the DMC's second interim analysis before the DMC reported the results. They conclude that the Complaint is doomed for its failure to support Defendants' actual knowledge of the results before the DMC's July 2020 report.

2

Defendants ignore that before they spoke during the Class Period, touting ThermoDox and the OPTIMA trial results, the results were complete. Proceeding with OPTIMA was futile, and the FDA would not approve ThermoDox. Thus, before Defendants ever uttered any of the factual statements or opinions the Complaint alleges as false, Defendants knew, and do not contest, that the facts relevant to the second interim analysis already existed. The trial participants whose deaths would be analyzed had already died, and the futility boundary had already been crossed. The results were set, even if Defendants did not know them yet.

In that context—proceeding with OPTIMA and seeking FDA approval of ThermoDox was futile—the Complaint adequately pleads that Defendants' statements were materially false. More, given that the data set was immutable, then-existing facts before the Class Period, Defendants' Class Period statements are not forward-looking, and Defendants cannot escape liability by invoking the PSLRA's safe harbor. All of the false statements were based on the underlying premise that the ThermoDox study was on track, as Defendants explicitly stated, and that a positive result was possible after it was already not possible. Every false statement is based entirely on then-current underlying facts that were material and wholly adverse. Defendants are not entitled to safe harbor protection for misleading about then-existing facts, and not entitled to its protection for the future part of each statement when the present, then-existing part of each statement was false.

Misleading investors with their opinions that the second interim analysis could yield a positive result was fraud, because immutable facts already existed that rendered success impossible. The facts here are stronger than those of *Omnicare*. In that case the information that Defendants failed to disclose was a conflicting opinion that might have proved wrong in the future. The Supreme Court ruled that even as the statement in question was an opinion, Defendants had a

3

clear duty to disclose the conflicting information. Here, the conflicting information was not a contrary opinion, but immutable facts that wholly belied any positive statement about the OPTIMA Trial or the likelihood of the FDA approving ThermoDox. That is, the deceased trial participants had either received ThermoDox or a placebo, and the numbers of each were set. Defendants' statements of actions they were presently taking in anticipation of good results were misleading because conflicting information already existed rendering the possibility of good results or FDA or European FDA approval, at the time Defendants spoke, an impossibility.

Nor are the false statements puffery. Defendants' statements about their most important drug were material, drove up the price of the stock, and Defendants took advantage of this to raise millions, selling 2.67 million shares in a secondary offering. All the cases Defendants cite are distinguishable. Knowing their puffery argument fails, Defendants urge this Court to consider a SeekingAlpha article that is entirely extraneous to the four corners of the Complaint, and to consider it not just for its existence, but for what Defendants proclaim was its effect on Celsion's stock price. The Court may not consider the extraneous material, and certainly not for the concocted importance Defendants ascribe to it. The Complaint adequately pleads that all of the statements alleged as false were indeed materially false and misleading.

The Complaint also adequately alleges Defendants' scienter. Defendants were severely reckless in their public statements. Defendants faced a choice when they opined about the present facts and the second interim DMC analysis—disclose the results or bear the risk of loss when the DMC disclosed then-existing, not future, results. The Complaint does not plead they knew and Defendants waste words arguing that they did not know the second interim results until the DMC report in July 2020. Whether they knew, however, is of no moment. Defendants were permitted to disclose that OPTIMA had reached the second interim review milestone. Since the Complaint does

4

not allege that they were unblinded to the results of the second interim analysis, Defendants were required to refrain from positive statements about the results. Given the indisputable existence of a negative existential fact, as a matter of law, Defendants spoke positively at their own risk. Defendants could have merely repeated what they said in November 2019, when they did not make statements similar to their Class Period statements. Misleading investors to believe that a positive result was likely in the face of immutable facts was severely reckless. Investors should not pay the price for Defendants' reckless gamble.

The Complaint adequately pleads loss causation. Defendants attempt to self-exculpate, introducing the extraneous SeekingAlpha article as evidence somehow to disprove loss causation at the pleading stage. As a matter of law, however, in an efficient market, which is adequately alleged and which Defendants do not contest at the pleading stage, an analyst opinion that simply rehashes already-public information cannot cause inflation or loss. That is so because in an efficient market, the stock price already incorporates the public information. Further, upon disclosure of the material adverse information, Celsion's common stock price plummeted. This uncontroverted fact adequately alleges loss causation.

Finally, Defendants simply make facts up. They repeatedly raise Covid-19, and baldly state that it caused the results at the second interim analysis to cross the futility boundary. The Court may not consider facts that Defendants know are not in the Complaint. In fact, as pleaded, when asked about the possible reasons for the negative results in the second interim analysis, Defendants specifically cited "data maturity issues," never mentioning Covid.

This Court should deny Defendants' motion to dismiss in its entirety.

## II.    STATEMENT OF FACTS

Celsion is a fully integrated, clinical stage biotechnology company that advances directed chemotherapies through clinical trials for the treatment of cancer. Celsion has never received FDA approval for or commercialized any product it developed. ¶26.[2] During the Class Period Celsion's lead development product was ThermoDox, a proposed treatment for primary liver cancer, designed to be administered alongside radiofrequency ablation ("RFA"). ¶27.

In 2013 Celsion concluded its HEAT clinical trial for ThermoDox. Although the Phase III trial failed its primary endpoint of Progression-Free Survival, a subsequent statistical analysis of a sub-group suggested that ThermoDox might increase Overall Survival if it was administered with at least 45 minutes of RFA. ¶¶29-32.

In 2014 the FDA approved the Phase III OPTIMA trial of ThermoDox to be administered along with at least 45 minutes of RFA. ¶33. The trial would be double-blinded and placebo-controlled. ¶33. The trial was designed with interim reports after 128 and then 158 deaths, and a final report after 197 deaths. ¶34. The Company set up an independent Data Monitoring Committee ("DMC") to process the information for the interim and final analyses, and to issue recommendations. ¶34. The trial enrolled 556 patients, with the largest single group in China, which accounted annually for half of the world's diagnoses of liver cancer. ¶¶27, 35.

From 2015 until the issuance of the first interim report in November 2019, Defendants touted the strength of the preclinical and clinical data, data and publications that highlighted ThermoDox's potential, support for the hypothesis of the OPTIMA trial, the "remarkable" results of the analysis of the HEAT study subgroup, the execution of the OPTIMA trial, and the importance of ThermoDox in the oncology field if the trial was successful. ¶¶36-47.

---

[2] "¶" refers to paragraphs in the Complaint.

6

In August 2019 Celsion announced that the 128-death benchmark had been reached for the DMC to perform the first interim analysis. ¶46. On November 4, 2019, Celsion issued a press release stating that the DMC's first interim analysis recommended continuing the clinical trial, even as the DMC had not reached any conclusions about the Overall Survival endpoint, because not enough time had passed to draw conclusions. ¶¶48-49. On November 15, 2019, Celsion admitted that the trial had not met the hazard ratio for success at the first interim analysis. ¶51. Defendants stated that nevertheless, the science and preclinical evidence were compelling. ¶51. Celsion announced that at the second interim analysis, the hazard ration for success would be 0.70, indicating that the treatment reduced the hazard of death by 30%. ¶50.

Defendants did *not* state in November 2019, discussing the first interim analysis results, that Celsion was preparing NDA letters for the FDA, beginning the process of applying for European approval, might receive Chinese FDA approval as a foreign company without first receiving FDA approval, or that it might be able to do any of these things while skipping entirely the final analysis and report. *See* ¶¶48-51.

By March of 2020, 158 trial subjects had died, triggering the DMC's second interim analysis. ¶53. That is, the facts about where the deceased trial participants lived, how long after receiving ThermoDox or a placebo they had died, and whether they received ThermoDox or a placebo were already immutable facts. So too then were the statistical results to be drawn from the facts. As disclosed later, some of the immutable facts were that between the first and second interim analyses there were 26 consecutive trial participant deaths in a pattern significantly different than those that preceded the first interim analysis, with 65% of those deaths patients who had received ThermoDox and not the placebo. ¶53. In the Asia-Pacific region during that period, 15 out of 16 trial participants who died had received ThermoDox and not the placebo. ¶54.

Though the facts of the results of the second interim analysis all existed and were immutable, from the start of the Class Period in April 2020, Defendants stopped limiting their comments to the facts and their opinions about the November 2019 results. Instead, they optimistically touted the expected positive result of the second interim analysis, when their opinions were objectively false. ¶55. On April 15, 2020, Defendants stated that the first interim analysis showed that Overall Survival appeared consistent with the HEAT study subgroup, ¶55, even as they had previously stated that no such conclusion could be drawn at the first interim analysis, ¶49, and that a successful result in the clinical trial would have "blockbuster revenue potential." ¶55. They added that they were "quite optimistic for a positive result." ¶64.

On May 15, 2020, in the context of having reached 158 deaths, ¶56, and in the face of immutable facts to which they were blinded, Defendants told investors that the results were positive with a "very good potential for success," and that the "study is on track for success." ¶¶57, 66. Defendant Tardugno told investors that the results of the second interim analysis might be so positive that the FDA would not even require the OPTIMA study continue to the final analysis, twice describing the final analysis as only "if it's necessary." ¶¶58, 67. He added that Celsion was already "drafting … the NDA and NAA for Europe for ThermoDox and HCC." ¶¶58, 67. Responding to an analyst question, Tardugno stated that if results were positive, Celsion would immediately place a call to the FDA for a pre-NDA meeting, skipping the final analysis after 197 deaths, and that Celsion was "drafting that letter as we speak." ¶¶58, 67.

During Celsion's June 15, 2020, shareholder meeting, Defendants repeated this statement that results might be so positive that Celsion could proceed directly to requesting FDA approval, stating "if a final analysis is needed." ¶61. Also during the June 15, 2020 shareholder meeting,

8

Defendants stated that they were very confident that the DMC would give them a positive result at the second interim analysis. ¶69.

Analysts bought into Defendants' characterization of the then-existing and immutable results for the second interim analysis. ¶59.

Defendants' optimistic statements from April to June of 2020 about the already-existing results caused Celsion's stock price to spike in May and June of 2020. ¶60. From May 20, 2020, to June 19, 2020, Celsion's stock price rose from $1.48 to $5.26. ¶¶60, 83-84. Celsion took advantage of the material stock price increase their statements caused. On June 22, 2020, Celsion announced that it had raised $10 million dollars by selling stock to an underwriter at $3.75 per share compared to its February 2020 offering at $1.05 per share. ¶¶63, 86.

On July 13, 2020, Celsion issued a press release stating that the DMC's recommendation at the second interim analysis was that Celsion consider stopping the OPTIMA trial. ¶73. The pre-specified futility boundary of 0.90 had been breached, meaning that ThermoDox reduced the risk of death by less than 10%. ¶73. Celsion expressed surprise and disappointment at the results. ¶73. On July 15, 2020, Defendants, now unblinded, stated that there was only a "slim chance" that ThermoDox would meet its prespecified target for success. ¶75. The Company nevertheless determined to continue the OPTIMA study. ¶73.

In an August 4, 2020, press release, Defendants stated that there had been 26 consecutive patient deaths, included in the second interim analysis, whose results were different than other deaths, with 17 of the 26 receiving ThermoDox and not the placebo. ¶¶76, 79. Defendants concluded that the different pattern might indicate a "data maturity issue." ¶¶76, 78-79. Defendants made no mention of Covid having any effect on the results. *See* ¶¶76-79.

In an August 14, 2020, press release, Defendants announced that they would continue the OPTIMA study, adding that the second interim analysis results would not have been forecasted by the first interim analysis, ¶77, even as the Company had earlier admitted that the trial had not met the hazard ratio for success at the first interim analysis and that the DMC had not reached any conclusions about the Overall Survival endpoint in that earlier interim analysis. ¶¶49, 51.

In an October 12, 2020, letter to shareholders, Defendants stated that in the Asia-Pacific region, 15 out of 16 trial participants who died between November 2019 and April 2020 had received ThermoDox and not the placebo. ¶80.

In a February 11, 2021, letter to shareholders, Defendants disclosed that the National Institutes of Health and a private research organization had reviewed all of the unblinded data, and neither had found evidence justifying continuing the OPTIMA study. ¶81. The OPTIMA study was over. ¶81.

## III. ARGUMENT

### A. Legal Standard in Securities Fraud Cases

To state a claim for securities fraud under § 10(b) and Rule 10b-5, a plaintiff must allege (1) the purchase of a security; (2) a material misrepresentation or omission by the defendant; (3) scienter; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011). These claims are subject to the pleading standards of the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b), requiring allegations of fraud to be stated with particularity. 15 U.S.C. § 78u-4(b). The PSLRA does not require a plaintiff to plead evidence, since on a Rule 12(b)(6) motion to dismiss, courts must accept all factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007) (quoting *Tellabs I*, 551 U.S. at 322).

**B.**    **Defendants Misrepresent that the Complaint Alleges that Celsion was Unblinded Early to the Results of the Second Interim Analysis**

Defendants rely heavily on an incorrect factual predicate. Defendants argue that the Complaint alleges that Defendants were unblinded to the results from the DMC's second interim analysis before the DMC reported the results. *See* D.Br. at 3-4, 10, 13, 17, 19. Attempting to build on that false premise, Defendants argue that Plaintiff is alleging "a conspiracy of independent scientists and physicians … to violate basic standards of scientific integrity." D.Br. at 3. Defendants conclude that the failure to support this assertion renders the Complaint "deficient on its face." D.Br. at 10.

Even as they advance that straw person, Defendants acknowledge, D.Br. at 13, however, that the Complaint does not allege that Defendants were unblinded to the second interim analysis results before July 2020, instead repeatedly stating that the "information existed," not that Defendants knew the information during the Class Period. *See, e.g.,* ¶¶65, 69. The straw person Defendants erect and then knock down is a red herring, and all of their arguments relying on their false premise are irrelevant to the distinct legal question presented here, and merit no consideration whatsoever. Indeed, in their unduly prolix Memorandum, Defendants do not confront the critical legal question of whether they acted severely recklessly in making demonstrably false statements during the Class Period. Because they did, the Complaint adequately pleads securities fraud.

**C.**    **The Complaint Adequately Alleges Falsity**

To plead a material misstatement, Plaintiffs must plead "the who, what, when, where and how: the first paragraph of any newspaper story." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009). "'The test for whether a statement is materially misleading under Section 10(b)' is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor.'" *In re*

11

*Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (emphasis in original) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004)).

The Complaint adequately alleges each of Defendants' Class Period statements was materially false. Defendants touted that the results of the second interim analysis could be, and indeed were likely to be, positive, when the die was already cast: proceeding with the OPTIMA study was futile and the chances of FDA approval were slim to none. Defendants based each of the statements the Complaint alleges was materially false on an explicit or implicit present assertion, that at that moment the second interim analysis had a possibility of success. It did not. As a successful therapy for primary liver cancer, the future for ThermoDox was poor. Everything positive that Defendants stated after 158 study deaths that contradicted the truth was materially false.

The Third Circuit has long ruled that "statements of opinion by top corporate officials may be actionable if they are made without a reasonable basis." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1428 (3d Cir. 1997) (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1098 (1991)). In *Burlington*, the Third Circuit extended liability for opinions from an executive's expression that a merger price was "fair" to her or his expression of comfort with analysts' projections. *Id.* Fundamentally, however, if facts exist showing that an opinion had no reasonable basis, the opinion is actionably false.

Defendants' statements fit that bill. Before the Class Period ever began, the second interim analysis data set was complete. ¶55. No events from the start of the Class Period would, or could, change the outcome. Defendants' words could influence investors and Celsion's stock price, but could not change the already-immutable facts. The second interim analysis would fail to achieve its hazard ratio goal of 0.70, and it would breach the 0.90 futility boundary. No reasonable basis

12

whatsoever existed, therefore, for Defendants to state anything positive about the OPTIMA trial during the Class Period, and the positive statements about the OPTIMA trial or the prospects for commercializing ThermoDox were subjectively false.[3]

In addition to an opinion's being unreasonable, the Supreme Court has discussed further the actionability of opinions. In *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015), the Supreme Court ruled that an opinion can materially mislead for the speaker's omitting facts or opinions that rebut the speaker's inference. *Id.* at 191. Justice Kagan explained the legal issue simply. If a person says, "we believe our conduct is lawful," but has not consulted a lawyer, the statement could be misleadingly incomplete. *Id.* at 188. This is so because a reasonable investor "expects such an assertion to rest on some meaningful … inquiry— rather than say, on mere intuition, however sincere." *Id.* The implications are clear. To avoid making materially misleading statements, consult a lawyer—***or do not issue the opinion at all***.[4]

The facts here are stronger than those in *Omnicare*. In *Omnicare*, Defendants stated that they believed that their contracts were legally valid, *id.* at 179–180, but failed to disclose a contrary legal opinion within the company. *Id.* at 180. That hidden opinion may have been wrong or may

---

[3] All of the "hindsight" cases Defendants cite, D.Br. at 19, are distinguishable. Here, facts did not come into existence later that proved Defendants' opinions wrong, as in Defendants' cited cases, but existed when the opinions were issued. *See, e.g.*, *In re Columbia Lab'ys, Inc. Sec. Litig.*, 144 F. Supp. 2d 1362, 1370 (S.D. Fla. 2001) (no results when defendants spoke); *Weinstein v. Kirkman*, No. C13-0769-JCC, 2013 WL 12121125, at *3 (W.D. Wash. Sept. 16, 2013) (defendant's statement made when data collection process not complete).

[4] Insider trading cases are analogous. An insider either has to disclose material non-public information before he trades, or refrain entirely from trading. *Oran v. Stafford*, 226 F.3d 275, 285–86 (3d Cir. 2000). *See also In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 583 (D.N.J. 2001) ("once a disclosure is made, the disclosing party has an obligation to ensure that the representations are accurate"). Since the data set here was complete, Defendants' positive statements were both unreasonable and subjectively false. Condoning any defendant's positive statements in the face of existing contradictory information, even where Defendants are blinded, grants companies a license to mislead, and to raise money off their misleading statements.

13

have been right. Here, the undisclosed information was an immutable fact. Defendants' opinions about the second interim analysis were all, with no qualification, dead wrong. The results were set when 158 deaths were reached, and Defendants knew that and disclosed that the deaths had occurred and the true facts already existed. ¶¶53, 56. Defendants could have properly referred to their November statements concerning the first interim analysis, and could have informed investors that 158 deaths had been reached and that the DMC would issue results at some expected time. What they could not do is what they did, issue opinions in the face of existing facts that prove those opinions false. As the Complaint does not allege that Defendants were unblinded, so they could not even conduct the meaningful, indeed dispositive, inquiry, *Omnicare* stands squarely for the proposition that Defendants were required to refrain from positively characterizing the prospects for positive second interim analysis results or for FDA approval.[5]

In this context, the Complaint adequately pleads as false all of the statements made during the Class Period. That "the study is on track for success," ¶66, a mixed statement of then-existing fact ("on track") and future belief ("for success") contradicted information about the trial participants who died between the first and second interim analyses, information Defendants knew already existed. ¶¶53, 56. In the absence of telling investors the already-existing facts, which the Complaint does not allege Defendants could do at the time, Defendants were duty-bound not to mislead, and not to issue their opinion. Similarly, that Defendants were "quite optimistic for a positive outcome," ¶64, believed that OPTIMA had a "very good potential for success at this analysis," ¶66, stated that "our confidence is quite good for a positive result at this meeting of the DMC," ¶69, and that "this tracking appears to bode well for success at the next pre-planned interim

---

[5] *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 480–81, 486 (S.D.N.Y. 2018) is distinguishable. In that case defendants spoke positively about already publicly disclosed interim results and previously published studies and not about undisclosed results.

efficacy analysis," ¶71, were not only opinions that were wrong when uttered, but materially misleading for Defendants' failure to tell investors the actual existing facts, or in their absence remain silent on the subject and not mislead investors to believe the results could be positive.

Defendants' other opinions are even more misleading for their specificity. The *Omnicare* court stated that "a reasonable investor generally considers the specificity of an opinion in making inferences about its basis," continuing "a reasonable person would think that a more detailed investigation lay behind" the more detailed statement "I believe we have 1.3 million TVs in our warehouse," than the less-detailed "I believe we have enough supply on hand to meet demand." *Omnicare*, 575 U.S. at 1329, n.8. Here, Defendants stated that Celsion was already "drafting … the NDA and NAA for Europe for ThermoDox," ¶67, that "we're drafting the letter as we speak"[6] to send to the FDA for a formal pre-NDA meeting, ¶67, and made repeated statements that the results could be so good that no final analysis would be required, stating "if a final analysis is needed." ¶69. These detailed statements about actions Defendants had already taken were materially misleading for stating not only that a positive result at the second interim analysis was possible, but likely. In the face of existing facts rendering that result impossible, Defendants' statements were unreasonable and false when made.[7]

---

[6] That Celsion may have actually been drafting the letter, *i.e.*, that this portion of the statement might be literally true, offers Defendants no comfort. "Defendants inappropriately focus on the literal accuracy of the statements instead of whether the statements accurately informed rather than misled prospective buyers." *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, No. CV 17-341, 2020 WL 1479128, at *16 (E.D. Pa. Mar. 25, 2020). Here, Defendants' statements that it was preparing letters to the FDA and that the final analysis might be skipped misled investors to believe that FDA approval was possible, even likely, when already-existing facts meant this result was impossible.

[7] *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159 (3d Cir. 2014), cited by Defendants, *see* D.Br. at 22, is distinguishable. In *Pfizer*, the company knew all the information, and there was a difference of opinion internally about whether the results justified initiating a Phase III trial for Pfizer's Alzheimer's drug candidate or conducting another Phase II trial. *Id.* at 170. Here, there was no debate. The already-existing results showed that continuing the trial was futile.

15

### 1.    The PSRLA Safe Harbor Does Not Shield Defendants From Liability

Defendants argue that their subjectively false statements are forward-looking, and that the PSLRA's safe harbor shields them from liability. D.Br. at 25-27. They are incorrect. All of Defendants' false statements were mixed statements of present fact and future prediction, and not entitled to the protection of the safe harbor.

The PSLRA establishes a "safe harbor" for forward-looking statements that an issuer accompanies with meaningful cautionary language. To qualify for protection, however, the statement in question must actually be forward looking, the cautionary language meaningful. The Third Circuit has ruled that "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Avaya*, 564 F.3d at 255 (quotation omitted). Similarly, and more recently, the Ninth Circuit ruled in *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017), that "a defendant may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor provisions of the PSLRA by combining non-forward-looking statements about past or current facts with forward-looking statements about projected revenues and earnings." 865 F.3d at 1141.[8]

*McDermid v. Inovio Pharms., Inc.*, No. CV 20-01402, 2021 WL 601159 (E.D. Pa. Feb. 16, 2021), is on point. In *Inovio*, the court ruled as false defendants' claim that the company was "on track to produce one million doses … by the end of 2020." *Id.* at *8. The safe harbor did not apply to this "mixed present/future statement" because the "on track statements could not meaningfully be distinguished from the future projection of which they are a part," *id.,* because defendants lacked

---

[8] Further, if the non-forward-looking portion of a statement is materially false or misleading, as Defendants' statements were here for misleading investors to believe the second interim analysis results might be positive, "no cautionary language … short of an outright admission of the false or misleading nature of the non-forward-looking statement would be 'sufficiently meaningful' to qualify the statement for the safe harbor." *Id.* at 1146–47.

16

the manufacturing capacity to manufacture that many doses. In other words, when defendants spoke it was impossible to reach their manufacturing goal because of then-existing facts.

That is precisely the factual situation here. All of Defendants' false statements spoke of future events, that positive results were possible, based on then-existing present conditions. But the then-existing facts rendered any positive result literally impossible. The ThermoDox trial had failed before Defendants spoke. "[T]he study is on track for success," ¶66, is identical in form to the statement in *Inovio*. It was not "on track" at the moment Defendants spoke, in fact it had permanently derailed. The "if it's needed" statements about the final approval, ¶69, were based on a present assertion that things were going well, when they objectively were not and could not. Celsion's statements that it was "drafting … the NDA and NAA for Europe for ThermoDox," ¶67, and that "we're drafting the letter as we speak" (to send to the FDA for a formal pre-NDA meeting), ¶67, both based positive future predictions (FDA and European approval) on actions that Defendants were already taking, actions that suggested a likely positive result that would never happen. The rest of the statements, where Defendants expressed "optimism" and "confidence" about a positive outcome, ¶¶64, 69, and spoke of the "very good potential for success," ¶66, all have the same underlying present assertion of fact, that present conditions meant that the second interim analysis could yield positive results. But just as in *Inovio*, when Defendants spoke the future prediction was *impossible* because of already-existing, immutable facts. *See* ¶¶53, 56. The PSLRA safe harbor protects none of Defendants' subjectively false statements.[9]

---

[9] In any event, the risk warning that Defendants claimed they issued, that clinical trials were uncertain, D.Br. 26, had already materialized when Defendants spoke. The clinical trial had failed, and ThermoDox would never receive FDA approval. A risk warning is not meaningful when it warns that something might occur when it has already occurred. *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 107 (D.C. Cir. 2015) (risk warning that products may become obsolete when the obsolescence issue is already intractable not meaningful).

## 2.    Defendants' False and Misleading Statements Are Not Puffery

Defendants argue that some of their statements are inactionable puffery. D.Br. at 24-25. They are incorrect. A statement is puffery if it is vague and general and "understood by reasonable investors as such." *Payne v. DeLuca*, 433 F. Supp. 2d 547, 561 (W.D. Pa. 2006) (citation omitted). Statements are not puffery if in context, it is of a type that investors rely on in making decisions. *Id.* at 561-62. Further, the source of the comment may determine whether a statement is actionable, and statements of opinion by top corporate officials made without a reasonable basis are actionable. *Id.* at 562 (citing *Burlington*, 114 F.3d at 1428).

Defendants' statements about its most advanced clinical trial were undeniably of interest to investors. In *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939 (3d Cir. 1993), the Third Circuit ruled that a claim of "superior engine protection" was not puffery, as it "involve[s] more than a mere generality," and "is both specific and measurable." *Id.* at 945–46. The OPTIMA trial was potentially existential, and Defendants statements were both specific (*e.g.,* "drafting that letter as we speak") and measurable when they were made. There would be no positive result in the second interim analysis. The possibility of success was already dead.

Further, the subject matter renders the statements not puffery. Celsion was a company that had never achieved FDA approval for or earned a penny from any drug it developed. ¶26. The failure of the OPTIMA trial was a potentially existential event for Celsion, and investors understood the trial's importance. The statements alleged as false, *see* ¶¶64-72, were not "mere generalities," but were on the subject of the success or failure of the ThermoDox trial, a core issue to Celsion's future, and investors relied on Defendants' statements about the OPTIMA trial in

18

making decisions.[10] *Cf. Virginia Bankshares*, 501 U.S. at 1083 (ruling opinions in proxy statement material "if there is a substantial likelihood that a reasonable shareholder would consider it important ….").

The cases Defendants cite are distinguishable. In *Bauer v. Eagle Pharms., Inc.*, No. CV 16-3091(JLL), 2017 WL 2213147, at *12 (D.N.J. May 19, 2017), the statements ruled puffery were not, as Defendants claim, similar to those here, but instead were claims that a product was "unique," "far superior" to other generic drugs, should do "very well" and will be "well received." The facts of *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218 (S.D.N.Y. 2009), are equally dissimilar. In that case "we hope to be able to announce something," and we "hopefully get approved" were ruled puffery. *Id.* at 230. These statements are not akin to statements that Celsion was drafting letters in anticipation of positive results (that could never come). Defendants' "puffery" challenge to their statements expressing "optimism" are meritless.

As such, because the then-existing facts rendered Defendants' statements unreasonable—even subjectively false—the Complaint adequately pleads material falsity.

### D.    The Complaint Adequately Alleges Scienter

Defendants argue that the Complaint fails adequately to allege scienter. D. Mem. at 27-29. While their argument is bloated with surplusage, distilled to its essence, it hinges upon whether the study results were unblinded to them. Defendants contend that the Complaint fails to state a claim because it fails to plead that at the time they disseminated subjectively false statements,

---

[10] *See In re Volkswagen 'Clean Diesel' Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 3058563, at *17 (N.D. Cal. July 19, 2017) ("environmentally friendly" not puffery since environmental friendliness was a core aspect of business).

they knew that proceeding with the OPTIMA study was futile and that the FDA would likely not approve ThermoDox. D. Mem. at 4, 10, 13, 17, 19.[11]

Rather, the fundamental question here is, as a matter of law, whether Defendants were severely reckless in touting the second interim results and the likely success in achieving FDA approval and commercializing ThermoDox when the results, already set, showed the exact opposite. Because Defendants were severely reckless, they are liable for violations of SEC Rule 10b-5.

> **1.     Defendants Were Severely Reckless in Speaking Positively About the OPTIMA Trial Results After the Results Demonstrated That Proceeding with That Trial Was Futile**

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Matrixx*, 563 U.S. at 48. Plaintiff must allege facts giving rise to a strong inference of "either reckless or conscious behavior," *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534–35 (3d Cir. 1999), "involving … an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Avaya, Inc.*, 564 F.3d at 280 (quoting *Advanta*, 180 F.3d at 535). The inquiry is holistic, "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs I*, 551 U.S. at 310 (emphasis in original). An inference of scienter is "strong" if it is "cogent and compelling," *id.* at 324, and "*at least as likely as* any plausible

---

[11] This is not a question of allegation or fact. Plaintiff is unaware whether someone unblinded the results from the second interim data set to Defendants. Defendants expend effort improperly submitting extraneous materials to show the Court what "double blind" means and to prompt it to rule that because it means blind, it must be so in this case. The problem for Defendants is that the Complaint does not plead, in any way whatsoever, that someone unblinded the results to Defendants during the Class Period. The Court will therefore accept as true at the pleading stage that Defendants were not unblinded.

opposing inference," with the tie going to the plaintiff. *Id.* at 324, 328 (emphasis in original). The scienter inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* Indeed, scienter can be inferred from "circumstantial evidence." *Burlington*, 114 F.3d at 1418; *accord Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) (allegations of circumstantial evidence are all that is required to plead scienter).

Defendants' Class Period statements were an extreme departure from ordinary care. The November 2019 results were far from outstanding, the DMC concluding that the results missed the target hazard ratio and merely recommending the clinical trial continue. ¶51. Without Defendants knowing the second interim analysis results, saying anything during the Class Period other than facts, that 158 deaths had occurred and that the DMC would at some point reveal results, presented an obvious danger of misleading. Even if the second interim analysis results had been middling rather than terrible, and the OPTIMA study would continue but Celsion would not skip the final analysis and would not send letters to government agencies applying early for European and FDA approval of ThermoDox, investors would be misled, including those with a particular investment timeline. The fact that the results were set, which Defendants knew, ¶¶53, 56, and showed futility before Defendants spoke made the risks Defendants took in speaking starker. That Defendants cynically took advantage of the stock price they pumped up with their statements to raise cash cheaper strengthens the already-strong inference of scienter.

The securities laws were enacted to prevent the type of ploy in which Defendants engaged. The Supreme Court has on multiple occasions noted that it was "the fundamental purpose of the [Securities Exchange] Act to substitute a policy of full disclosure for the philosophy of *caveat emptor* …." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) (quoting from earlier cases); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir. 1997) (same). Further, the "purpose

21

of the federal securities laws is to ensure that investors have sufficient information to assess and avoid undue risks by refraining from purchasing securities that carry greater risks than the investor is willing to bear. When … an investor is injured [by an intentional failure to disclose], the federal securities laws provide a remedy." *Sonnenberg v. Prospect Park Fin. Corp.*, No. CIV. 91-435(DRD), 1991 WL 329755, at \*9 n.5 (D.N.J. Aug. 20, 1991). Investors should not have to pay the price for Defendants' reckless gamble.

Analogous criminal law supports a conclusion that Defendants had fraudulent intent even if they were unaware of the results from the second interim data set. In *Borden v. United States*, 141 S. Ct. 1817, 1852 (2021), discussing *mens rea*, the Court wrote that "negligence … is not volitional." "Reckless behavior, like throwing a plate against the wall or firing a gun at a house, is different …." The "harm such conduct causes is the result of a deliberate decision to endanger another—no more an accident than if the substantial risk were practically certain." *Id.* at 1852 (internal quotation and citation omitted). The analogy is apt, and demonstrates Defendants' severe recklessness. With knowledge that the entire data set underlying the second interim analysis was already complete, Defendants made a "deliberate decision," choosing to be "volitional." They could have simply referred again to the November 2019 first interim analysis results. Instead, they chose to fire through the wall with their statements and opinions, not knowing if investors would get hurt, even as they knew that with the results already set, it was possible.[12]

The implications of Defendants' actions not being ruled reckless are dangerous. Defendants posit a world in which the federal securities law provides investors no remedy. In this

---

[12] *See also Hogan v. City of Easton*, No. CIV.A.04-759, 2006 WL 2645158, at \*8 (E.D. Pa. Sept. 12, 2006) (Defendant convicted of reckless endangerment for "firing a round from his shotgun into the basement wall"); *McNally v. Pierce*, No. CV 12-1303-GMS, 2015 WL 7566667, at \*6 (D. Del. Nov. 24, 2015) (firing a gun into a residence reckless behavior).

world, as long as a study is blinded a company can say anything it wants as a complete rebuttal to an allegation of reckless behavior. Defendants can choose to offer opinions and act in ways that materially increase their stock price, without knowing, or caring, if what they are saying is possible, much less likely. Defendants here chose to tell investors, for three consecutive months, their opinions that the results of the second interim analysis were going to be positive, to the point of stating that they were preparing all the documents to fast-track FDA approval as if they had already learned those results. Defendants' statements were undeniably wrong when they were made. Defendants now argue that they can simply walk away from their reckless choices, even as investors suffered harm. A just system meant to abolish *caveat emptor* cannot permit that behavior.

### 2. Defendants Raised $10 Million While Deceiving the Market About the Second Interim Results, Establishing Motive and Supporting a Strong Inference that They Acted With Requisite Fraudulent Intent.

More, the Court will review scienter allegations holistically. In this Circuit, even as motive and opportunity alone are insufficient to plead scienter adequately, motive allegations "may amplify an inference of scienter as part of the holistic information available to the court." *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473 (E.D. Pa. 2014) (citation omitted). The Complaint pleads just such motive and opportunity, supporting the Complaint's allegations that Defendants acted recklessly.

Defendants' actions in raising cash off the stock price their statements artificially inflated provide further strong evidence of their motive, and strengthen the already-strong inference of scienter. Defendants April-June 2020 positive statements caused Celsion's stock price to rise from $1.48 to $5.26. ¶¶60, 83-84. On June 22, 2020, Celsion announced that it had raised $10 million

(netting $9.3 million) by selling shares at $3.75 per share, more than three times higher than the $1.05 per share they received just months earlier, in February 2020. ¶¶63, 86.

Allegations of a unique connection between artificially raising the price of a stock and the need to raise funds, engage in a specific acquisition or offering, or to make a company more attractive to buyers, contribute to a strong inference of scienter. In *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 334 (E.D. Pa. 2020), allegations of needing to raise funds contributed to a strong inference of scienter.[13] *See also In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 648–49 (E.D. Va. 2000) (motive to enhance ability to raise cash contributes to inference of fraudulent intent); *Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 875 (D. Kan. 2019) (raising money in an offering was a motive to benefit specific transactions, contributing to finding of fraudulent intent);[14]

Considered holistically, the Complaint raises a strong inference of Defendants' scienter, at least as strong as any opposing inference. Scienter had been adequately pleaded.[15]

---

[13] *But see Bonomo v. Nova Fin. Holdings, Inc.*, No. CIV.A. 11-4762, 2012 WL 2196305, at *11 (E.D. Pa. June 15, 2012) (need to raise funds not indicative of a fraudulent motive).

[14] *See also In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (finding motive to commit fraud "to inflate company stock prices as a means to effectuate a specific acquisition that would not otherwise be possible without" the inflation); *In re Nevsun Res. Ltd.*, No. 12 CIV. 1845 PGG, 2013 WL 6017402, at *13 (S.D.N.Y. Sept. 27, 2013) (denying defendants' motion to dismiss, allegations of defendants' motivation to overstate gold reserves to increase the price for the sale of its 30% stake in a specific mine adequately pleaded scienter (citing *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000)); *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 455 (S.D.N.Y. 2007) (motive sufficient where "one party to a sale had a financial incentive to paint a far rosier financial picture than actually existed in order to induce the other party into a sale."); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) (inflating stock price to lessen the cost of acquisitions sufficiently pleads scienter, so long as the defendants raise no inference that is more plausible) (*citing to In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993) (motive sufficiently pled where defendant maintains artificially inflated stock price when disclosure would have lessened the stock's value prior to offering)).

[15] Finally, Defendants simply make facts up. They repeatedly raise Covid-19, and baldly state that it caused the results at the second interim analysis to cross the futility boundary. D.Br. at 2, 3, 11, 12. Besides being irrelevant, the Court may not consider facts that Defendants know are not in the

24

**E.    The Complaint Adequately Pleads Loss Causation**

Defendants argue that the Complaint does not allege a corrective disclosure theory. D.Br. at 29. They are wrong. The Complaint adequately alleges a causal connection between Defendants' statements, the stock price rise, and the stock price decline at the end of the Class Period. The Complaint therefore adequately alleges loss causation.

Allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA; all that is required is that plaintiff provide "some indication of the loss and the causal connection that the plaintiff has in mind," consistent with Rule 8(a). *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 348 (2005); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 180 n.24 (3d Cir. 2001) (to establish loss causation, "a claim must demonstrate that the fraudulent conduct proximately caused or substantially contributed to causing plaintiff's economic loss."). The issue of loss causation is usually not resolved on a motion to dismiss. *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000) ("Whether the plaintiff has proven [loss] causation is usually reserved for the trier of fact.").

In *Semerenko v. Cendant Corp.*, 223 F.3d 165, 184 (3d Cir. 2000), the Third Circuit ruled that the loss causation requirement is satisfied where the claimed loss involves the purchase of a security at an artificially inflated price that was caused by an alleged misrepresentation or omission. The Complaint here alleges that Defendants misrepresentations artificially inflated Celsion's stock price. *See, e.g.,* ¶¶2, 104. Lead Plaintiff purchased Celsion securities during the Class Period, ¶15, and upon revelation of the second interim analysis results Celsion's stock price fell materially. ¶74. This suffices to allege loss causation adequately at the pleading stage. *See*

---

Complaint. In fact, as pleaded in the Complaint, when asked about the possible reasons for the negative results in the second interim analysis, Defendants specifically cited "data maturity issues," ¶¶76, 78, never mentioning Covid.

*Dura*, 544 U.S. at 347 (at the pleading stage, a plaintiff need only provide the defendant "with some indication of the loss and the causal connection that he has in mind"); *Zhengyu He v. China Zenix Auto Int'l Ltd.*, No. CV21815530KMJAD, 2020 WL 3169506, at \*12 (D.N.J. June 12, 2020) (drop in stock price immediately following corrective disclosure sufficient to plead loss causation).

Defendants' false statements misleading investors to believe that it was possible, indeed likely, that the results of the second interim analysis would be positive, in the face of material adverse information that was fixed before the Class Period, artificially inflated the price of Celsion stock. Defendants' announcement that the results breached the futility boundary was a correction, and the artificial inflation was removed. Further, that same announcement was the materialization of a risk that had, in fact, materialized even before the Class Period. The Complaint adequately pleads loss causation.

Finally, Defendants urge this Court to inappropriately consider extraneous material, arguing that the SeekingAlpha article caused Celsion's stock price to increase, and not their own repeated positive statements. But an analyst report simply rehashing and interpreting publicly available information, in this case Defendants' own statements, cannot affect the stock price, as it already reflects the publicly available information. *See Meyer v. Greene*, 710 F.3d 1189, 1197–98 (11th Cir. 2013) (in an efficient market, analysis of publicly available information cannot affect stock price). The SeekingAlpha article is extraneous to the Complaint's allegations, legally irrelevant, including at the pleading stage, and cannot be considered.

26

## F.    The Complaint Adequately Pleads Reliance

Defendants' only argument with respect to reliance is that the Complaint fails to plead an actionable misrepresentations or omission. As the Complaint does exactly that, as described herein, Defendants' reliance argument fails.

## G.    The Complaint Adequately Pleads a Section 20(a) Violation

"Section 20(a) creates liability for 'controlling persons' in a corporation, 15 U.S.C. § 78t(a), and imposes joint and several liability upon anyone who 'controls a person liable under any provision of' the Exchange Act.'" *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 623 (D.N.J. 2001) (quoting *Rochez Bros. v. Rhoades*, 527 F.2d 880, 885 (3d Cir. 1975)). "To maintain a claim under §20(a), the plaintiffs must establish (1) an underlying violation by a controlled person or entity, (2) that the defendants are controlling persons, and that they were 'in some meaningful sense culpable participants in the fraud perpetrated by controlled persons.'" *Id.*

Plaintiffs have sufficiently alleged a Section 20(a) claim against the Individual Defendants. As set forth above, Plaintiffs have adequately alleged a primary violation of Section 10(b). The Complaint alleges and Defendants do not dispute that Defendants Tardugno, Church, and Borys were each high-level officers and directors of Celsion during the Class Period who controlled the Company's SEC filings and other public disclosures. *See* ¶¶17-19, 22-23. With respect to culpable participation, "the overwhelming trend in this circuit" is that "culpable participation does not have to be pled in order to survive a motion to dismiss." *Dudley v. Haub*, No. 2:11-CV-05196 WJM, 2013 WL 1845519, at *21 (D.N.J. Apr. 30, 2013) (citing cases); *see also Derensis v. Coopers & Lybrand Chartered Accts.*, 930 F. Supp. 1003, 1013 (D.N.J. 1996) (a plaintiff "need only plead circumstances establishing control because: (1) the facts establishing

27

culpable participation can only be expected to emerge after discovery; and (2) virtually all of the remaining evidence, should it exist, is usually within the defendants' control"). In any case, the false statements at issue were all made by the Individual Defendants. A Section 20(a) violation is adequately pleaded.

## IV.    CONCLUSION

For the foregoing reasons the Court should deny Defendants' motion to dismiss. Plaintiffs respectfully request leave to amend should the Court dismiss any part of the Complaint. *See* Fed. R. Civ. P. 15(a) (2) ("The court should freely give leave when justice so requires.").

Dated: September 20, 2021                              Respectfully submitted,

                                                       /s/ Gonen Haklay
                                                       Jacob A. Goldberg
                                                       Gonen Haklay
                                                       **THE ROSEN LAW FIRM, P.A.**
                                                       101 Greenwood Avenue, Suite 440
                                                       Jenkintown, PA 19046
                                                       Tel: (215) 600-2817
                                                       Fax: (212) 202-3827
                                                       ghaklay@rosenlegal.com
                                                       jgoldberg@rosenlegal.com

                                                       and

                                                       Laurence M. Rosen
                                                       **THE ROSEN LAW FIRM, P.A.**
                                                       One Gateway Center, Suite 2600
                                                       Newark, NJ 07102
                                                       Tel: (973) 313-1887
                                                       Fax: (973) 833-0399
                                                       Email: lrosen@rosenlegal.com

                                                       *Attorneys for Lead Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2021, a true and correct copy of the foregoing PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Gonen Haklay*
Gonen Haklay
